In the Matter of **PENN CENTRAL TRANSPORTATION COMPANY,** Debtor.

Petition of **CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.**

No. 70–347.

United States District Court, E. D. Pennsylvania.

May 28, 1974.

Harold E. Kohn, Philadelphia, Pa., for Consolidated Edison.

Norman L. Holmes, Philadelphia, Pa., for the Trustees of PCTC.

## MEMORANDUM AND ORDER NO. 1571

FULLAM, District Judge.

Consolidated Edison Company of New York, Inc. (hereinafter "ConEd") supplies to the Debtor electricity, steam and related utilities service, under approximately 123 different accounts. The present application involves services charged to seven major accounts, in which the average monthly billings are approximately $825,000.

Order No. 1 in these proceedings authorized the Debtor and, after their appointment, the Trustees of the Debtor, to pay operating expenses, including utilities bills. Shortly after Order No. 1 was entered, and before the Trustees had been appointed, ConEd filed a petition seeking immediate payment of all pre-bankruptcy billings (approximately $1.2 million remained unpaid for pre-bankruptcy utility services furnished by ConEd) and seeking to require a security deposit of approximately $1.7 million in cash as a guarantee against future billings.

By Order No. 18, I denied most of ConEd's petition, but modified Order No. 1 to the extent that the Debtor and its Trustees were directed, rather than merely authorized, to pay ConEd's bills during reorganization, within 15 days after presentation. This Order has been, and is being, fully complied with.

After the Trustees were appointed, ConEd renewed its petition for a security deposit. The request was denied, in Order No. 263, 328 F.Supp. 1276 (E.D.Pa. 1971). The Court of Appeals affirmed, 467 F.2d 100 (3d Cir. 1972), but expressed some concern about possible unfairness which might arise from the time lag between the furnishing of utility services by ConEd and its receipt of compensation from the Trustees, in view of the large amounts of money involved. The Court expressed the view that "upon proper application by [ConEd], the district court should consider possible expedients for shortening the interval between the appellant's supplying of energy and the trustees' payment for it" (467 F.2d at 104).

Thereafter, ConEd filed a petition (Document No. 4607) asking this Court to direct the Trustees to make weekly payments to ConEd, on an estimated basis, with appropriate adjustments on a monthly basis to reflect actual usage. A further evidentiary hearing was held, and the issues were briefed and argued, but for a variety of reasons, including in large measure inadvertence, the petition was not formally disposed of. Counsel for ConEd have recently renewed their request for a final decision of the matter.

The proposal for weekly rather than monthly billings is undoubtedly one of the measures which the Court of Appeals

suggested should be explored, but, contrary to the arguments advanced by ConEd, I do not interpret the Court of Appeals' opinion as mandating that ConEd's latest petition must be granted. In evaluating the feasibility, desirability, and fairness of ConEd's present proposal, or any other modification of the existing arrangements, it is necessary to consider the factual background in some detail.

At present, the billing arrangements are substantially as follows: The monthly billing period closes as of the 26th of each month. It takes ConEd about 10 to 15 days to prepare and submit its bills, and a like period for the Debtor to make payment. Generally, payment is made on or before the 20th day of the following month.

Utilities services are provided to the Debtor by nearly 1200 utility companies,[1] submitting bills to approximately 193 separate accounts. The accounting centers handling these accounts are located at New York City, Altoona, Pennsylvania, and Detroit, Michigan. The Detroit office makes payments to approximately 1144 utility companies, including ConEd (these payments total approximately $37,362,000 annually, of which approximately $2,695,000 goes to ConEd). The New York office handles payments to approximately 44 utility companies, including ConEd (payments total approximately $8,180,000 annually, of which approximately $7,697,000 goes to ConEd). The Altoona office makes payments to approximately 18 utility companies, at the rate of approximately $1,753,000 annually. The Debtor's total payments for utilities services aggregate approximately $47,295,000 annually. The Detroit office handles approximately 116,000 separate invoices for utility services each year, and the New York office handles approximately 1940 such invoices annually.

The utilities accounts handled by the Detroit office are completely computerized. The computers are programmed to weed out duplicate bills, call attention to bills which appear inconsistent with the pattern of previous billings to that account, and perform a variety of bookkeeping and accounting functions. In the New York office, apparently because of certain special conditions imposed by passenger service contracts, the actual processing of invoices for payment is accomplished manually.

Direct labor costs involved in processing each utility invoice in the Detroit office average 66 cents per invoice; in the New York office, the cost per invoice is $4.14.

The present method of handling billings and payments, as between ConEd and the Debtor, follows the same pattern which has been in effect between the two companies for many, many years. The only difference is that the Debtor's bills are now paid more promptly than they were before bankruptcy, and that there is a court order requiring such payment.

In any continuous course of dealings between major business corporations, it is to be expected that a pattern of billings and payments will evolve which the parties find reasonable and mutually convenient. Only in a very technical sense can these dealings be regarded as extensions of credit; and the longer the course of business continues, the less like credit transactions they become. So long as rail service over the Debtor's properties is being provided by the Debtor or its successors, the railroad will, in the nature of things, be acquiring energy from ConEd or its successors. Whether payments are to be made monthly, or weekly or daily or annually, is primarily a matter of accounting convenience. Obviously, more frequent billings (i. e., covering shorter spans of time) would theoretically reduce the risk to ConEd, if there were any risk, and would increase the benefit to ConEd through increasing the availability of the money for its use; but there would be corresponding disadvantages to both sides, by reason of the increased expense and bother of process-

---

1. Including some 35 companies whose billings exceed $100,000 annually.

ing the greater number of invoices. Over the many years of dealings between the railroad and ConEd, it is apparent that the parties hit upon monthly billing as representing the best balance of these conflicting considerations. The reasonableness of this solution seems to be demonstrated by the fact that it takes ConEd about the same length of time to process and submit a bill as it does for the Debtor to process and pay it.

It is not without significance that this accepted time lag between the furnishing of energy and receipt of payment for it has been taken into account and built into the rate structure of ConEd (see In Re Consolidated Edison Company of New York, Inc., case 26015, New York State Public Service Commission Reports, Vol. 12, No. 3, pp. 630, 671, 695 (Mar. 29, 1972); In Re Niagara Mohawk Power Corp., New York Public Service Commission Reports, 92 PUR 3d 461, 464–66 (Dec. 22, 1971).

I am not persuaded that there is any present justification for altering the established pattern in this case. The burden and expense to Penn Central, while perhaps not necessarily as grave as counsel for the Trustees has argued in this proceeding,[2] would obviously be substantial. I do not believe there is any equitable basis for treating ConEd differently from the other utilities supplying energy to the Debtor. To quadruple or even quintuple the number of invoices to be processed would entail a great deal of additional expense, on a continuing basis. Even the initial cost of reprogramming the computers would be substantial.

If imposing these additional burdens upon the Debtor's estate (and, to some extent, upon ConEd as well) would eliminate a risk to ConEd which would otherwise exist, then ConEd might well be justified in insisting upon changing the arrangements. But the reality is that there never has been a risk, and that

there is no risk now. If the Debtor is to reorganize pursuant to the plan of the Regional Rail Reorganization Act of 1973 ("RRRA"), it is clear that there will be continued rail operations over the Debtor's property, and that, if necessary, cash will be made available pursuant to § 213 of the RRRA, to enable the Debtor to pay its bills. While it is difficult to visualize any possible eventuality in which all rail service over the Debtor's properties (whether performed by the Debtor or by a successor) would terminate, even if that theoretical situation should arise, there could be no risk to ConEd. Even if the railroad were to be completely liquidated, it would still be necessary for the Trustees, as prudent managers, to move rolling stock, if for no other reason than to return foreign cars to their owners and make the Debtor's equipment available to others. Payment of the expenses of such movements, including continued purchases of energy from ConEd, would seem to have the highest possible priority. While I have no doubt that escrowed funds or other encumbered assets could properly be invaded for that purpose, it appears virtually certain that there would be unrestricted cash on hand amply sufficient to pay ConEd's bills as they accrued, in view of the time lag involved in collecting the Debtor's receivables.

Thus, it should be emphasized that this is not a case of balancing risks versus costs. There are no risks. The issue is simply whether or not ConEd, already in a better position vis-a-vis the Debtor than it was before bankruptcy, should be accorded still more favorable treatment, at great expense to the Debtor's estate. In my judgment, the answer must be negative.

And now, this 28th day of May, 1974, it is ordered that the petition of Consolidated Edison Company of New York, Inc. (Document No. 4607) is denied.

2. It seems unlikely that the per-invoice labor costs would remain constant if the number of invoices were increased.